RENDERED: MAY 16, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1113-MR

MARION HUGHES　　　　　　　　　　APPELLANT/CROSS-APPELLEE

APPEAL FROM JEFFERSON CIRCUIT COURT
v.　　　　　HONORABLE MITCHELL PERRY, JUDGE
ACTION NO. 07-CI-009996

UPS SUPPLY CHAIN SOLUTIONS, INC.;
AND UNITED PARCEL SERVICE,
INC.　　　　　　　　　　　　　APPELLEES/CROSS-APPELLANTS

AND

NO. 2023-CA-1187-MR

UPS SUPPLY CHAIN SOLUTIONS, INC.;
AND UNITED PARCEL SERVICE,
INC.　　　　　　　　　　　　　APPELLEES/CROSS-APPELLANTS

APPEAL FROM JEFFERSON CIRCUIT COURT
v.　　　　　HONORABLE MITCHELL PERRY, JUDGE
ACTION NO. 07-CI-009996

MARION HUGHES　　　　　　　　　　APPELLANT/CROSS-APPELLEE

OPINION AND ORDER
AFFIRMING WITH RESPECT TO APPEAL NO. 2023-CA-1113-MR;
DISMISSING WITH RESPECT TO CROSS-APPEAL NO. 2023-CA-1187-MR

** ** ** ** **

BEFORE: ECKERLE, L. JONES, AND KAREM, JUDGES.

JONES, L., JUDGE: On June 12, 2023, the Jefferson Circuit Court entered an order that (1) directed a verdict regarding a claim and "purported" claims that Marion Hughes asserted against the above-captioned appellees/cross-appellants (collectively UPS), and (2) dismissed Hughes' remaining claim against UPS in conformity with a unanimous jury verdict. According to the order, the circuit court's directed verdict encompassed, in relevant part, Hughes' "claim for disability discrimination under the Kentucky Civil Rights Act, KRS[1] Chapter 344"; her "purported claim for an alleged violation of KRS 336.700"; and her "purported claim for an alleged violation of the Kentucky Equal Opportunities Act, KRS Chapter 207." As for what the circuit court dismissed in conformity with the jury's unanimous verdict, the order labeled that remaining claim as Hughes' "claim for retaliation."

Hughes now appeals, arguing the circuit court should not have granted UPS's motion for directed verdict, and that it should have instead granted her motion for directed verdict with respect to every claim she asserted against UPS.

---

[1] Kentucky Revised Statute.

Alternatively, Hughes argues she is entitled to a new trial due to alleged evidentiary errors. UPS has filed a protective cross-appeal. Because we hold that the circuit court committed no substantial error, we affirm Hughes' appeal and dismiss UPS's cross-appeal.

## I. RELEVANT BACKGROUND

UPS hired Hughes in 2002 as a warehouse associate at its Elizabethtown, Kentucky, facility. Beginning in March 2003, her treating physicians issued her temporary work restrictions that prohibited her from lifting more than twenty pounds, and later more than ten pounds. In January 2006, Hughes took leave under the Family Medical Leave Act (FMLA)[2] to undergo surgery. In March 2006, near the expiration of her FMLA leave, she notified UPS that she intended to return to work, but with restrictions that permanently prohibited her from lifting more than ten pounds. However, UPS informed Hughes that it could not reasonably accommodate her permanent restrictions, and that she would need to take a personal leave of absence from work so long as her permanent restrictions remained in effect.

Because her permanent restrictions remained in effect, UPS required Hughes to remain on personal leave. On July 7 and October 13, 2006, Hughes

_____

[2] *See* 29 United States Code (U.S.C.) § 2601 *et seq*.

filed complaints with the Equal Employment Opportunity Commission (EEOC) that respectively alleged UPS had committed disability discrimination and retaliation against her in violation of the Americans with Disabilities Act of 1990 (ADA).[3]  The EEOC dismissed her claims and issued her a "right-to-sue" letter on April 17, 2007, after determining it could not resolve the merits of her charges. That same day, UPS terminated her employment.  This litigation followed. Additional facts relevant to this matter will be discussed below in our analysis.

## II. ANALYSIS

Before starting our discussion of whether the circuit court properly disposed of Hughes' claims or committed any evidentiary errors warranting a new trial, we are faced with the initial challenge of determining what the circuit court meant by "purported claims," and what the "claims" Hughes asserted in this matter were.  Two "claims" were the subjects of the trial below:  a "discrimination" claim and a "retaliation" claim.  But, they were not the "claims" Hughes specifically asserted in any of the written complaints she filed in the *seventeen years* this case was litigated; and to some degree, they were not the "claims" Hughes now wishes this Court to address for purposes of resolving these appeals.

---

[3] *See* 42 U.S.C. § 12101 *et seq.*

To explain, we turn first to Hughes' operative complaint, *i.e.*, her "second amended complaint," which she was given leave to file on March 7, 2012. She prefaced it by stating what she was *not* asserting:

> 3. Each of the Plaintiffs' claims arises solely under the laws of the Commonwealth of Kentucky. Plaintiffs expressly *do not* assert any claims arising under federal law.

She then proceeded to assert: (1) a class action against UPS based upon various alleged violations of KRS Chapter 337; and (2) a class action against UPS that took issue with some of its internal policies. Her KRS Chapter 337 class action is no longer the subject of any litigation, but her other class action persevered in a manner of speaking. To explain, and for purposes of clarity, we turn to the allegations of that class action:

**ILLEGAL DISABILITY LEAVE POLICIES**

- **CLASS ALLEGATIONS**

> 16. Plaintiff Hughes seeks class certification on the claim set forth in this *Second Amended Complaint* on behalf of a Class ("Leave Policies") defined as follows:
>
>> "All current and former employees of UPS who were employed in the Commonwealth of Kentucky during the applicable limitations period and who were subject to a UPS leave policy."
>
> 17. The Leave Policies Class is composed of individuals in numerous and various locations throughout the Commonwealth of Kentucky. The exact number is not known by Plaintiff. However, based upon documents

provided by UPS in discovery, it is expected that the Leave Policies Class will exceed 1,500 affected persons. Given this significant number of affected persons, joinder of Individual Leave Policies Class members in this action would be impractical.

18. Plaintiff and the Leave Policies Class members were subject to the same common facts and law. As employees working in the Commonwealth of Kentucky, each Leave Policies Class member was subject to the same laws and regulations governing disability (sickness and accident) leave policies. Further, each Leave Policies Class member was subject to the same leave policies, for example: (1) a 100% healthy leave policy; and/or an (2) automatic administrative termination after 12 months leave policy. As such, there are common questions of fact and law.

19. Plaintiff and the Leave Policies Class members were subject to the same course of conduct that gives rise to the claim asserted in this *Second Amended Complaint*. Their respective claim is identical – subject to the same policies, laws, regulations, and defenses. As such, Plaintiff's claim is typical of the Leave Policies Class members' claim.

20. Plaintiff has common interests with the Leave Policies Class members – a finding that UPS'[s] inflexible leave policies are illegal *per se*. Plaintiff's interests are not antagonistic or in conflict with the Leave Policies Class members. Further, in light of the lengthy time this case has been pending and the significant litigation that has already occurred on behalf of the Leave Policies Class members, Plaintiff has clearly demonstrated a willingness to vigorously prosecute the interests of the Leave Policies Class members through qualified counsel. Furthermore, Plaintiff has retained experienced counsel necessary for the prosecution of the Leave Policies Class' claim.

21. Requiring Leave Policies Class members to prosecute separate suits asserting the same claim and litigating the same facts and laws would create a significant risk of inconsistent or varying adjudications.

22. UPS has refused to act on grounds generally applicable to both Plaintiff and Leave Policies Class members, thereby making appropriate final injunctive relief, corresponding declaratory relief and/or compensatory relief with respect to the Leave Policies Class.

23. The injuries suffered by individual Leave Policies Class members may be relatively small making the expense and burden of individual litigation virtually impossible for Leave Policies Class members to individually seek redress. The likelihood that individual Leave Policies Class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, not to mention obtaining competent legal counsel. Finally, the prosecution of separate actions by Leave Policies Class members would create a risk of inconsistent adjudications establishing incompatible standards of conduct for UPS. Thus, a class action is the superior method for fair and efficient adjudication of this controversy.

- **FACTUAL ALLEGATIONS**

24. UPS is an "employer" as defined under KRS 337.010, KRS 344.030 and common law.

25. During all relevant periods, Plaintiff was an "employee" of UPS as defined under KRS 337.010, KRS 344.030 and common law.

26. UPS has adopted and enforced inflexible leave policies directed at UPS'[s] employees who have been off work for an accident and/or a sickness.

27. UPS has adopted and enforced a policy whereby employees who have been off work, for a sickness and/or accident, are not permitted to return to work with any work restrictions – 100% Healthy Leave Policy.

28. The 100% Healthy Leave Policy is a *per se* violation of Kentucky law.

29. UPS has adopted and enforced a policy whereby employees who have been off work for 12 months, for a sickness and/or accident, are automatically administratively terminated – 12 Month Leave Policy.

30. The 12 Month Leave Policy is a per se violation of Kentucky law.

31. Plaintiff was subjected to both the 100% Healthy Policy and the 12 Month Leave Policy.

- **ILLEGAL POLICY CLAIM**

32. As a Kentucky employer, UPS has violated Kentucky's laws and regulations by adopting inflexible disability leave policies, including the 100% Healthy Leave Policy and the 12 Month Leave Policy.

33. As a result of UPS'[s] per se violations, Plaintiffs and the Leave Policies Class have suffered real and compensable damages.

34. Plaintiff and the Leave Policies Class seek compensatory, equitable, and exemplary relief against UPS in an amount to be determined by a jury at trial to include costs, interest, attorneys' fees, and such other relief as is just and appropriate.

Second Amended Complaint, pp. 3-6; Record at 561-564.

In sum, Hughes' class action alleged that because UPS had instituted what she termed a "100% Healthy Leave Policy" and "12 Month Leave Policy" – policies she believed *could* discriminate against its employees who have been off work for an accident and/or a sickness – UPS was *per se* liable for damages or some other form of relief. We write that this class action only persevered "in a manner of speaking" because it was denied class certification; Hughes never formally amended her complaint afterward; and, taken strictly within the confines of how she alleged it, its viability as any kind of legally cognizable claim has never been recognized by any court. Nevertheless, after it was subsequently interpreted and elaborated upon by the circuit court (prior to Hughes' earlier appeal), by this Court (as part of that earlier appeal), and again by the circuit court (during mid-trial and post-trial directed verdict hearings prior to this appeal), it formed the genesis of her "discrimination" and "retaliation" claims now at issue.

To that point, we first discussed this "class action" in *Hughes v. UPS Supply Chain Solutions, Inc.*, No. 2020-CA-0643-ME, 2021 WL 3008755 (Ky. App. Jul. 16, 2021) (unpublished). There, we noted that Hughes, in her second amended complaint, had purposefully omitted any allegation that she or any of her putative class members was a "qualified individual with a disability" within the meaning of KRS 344.030(1); and that she had done so assuming that her class action, as she had alleged it, would not require her or any of her putative class

members to prove at trial that they were qualified individuals with disabilities. *Id.* at *3. In refusing to certify her "class," the circuit court disagreed with her, and we affirmed its rationale. To that effect, the circuit court noted similar claims asserted in the context of the ADA[4] had been rejected in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009):

> We have not previously addressed whether "100% healed" policies constitute per se discrimination under the ADA, and we need not do so here. Even if we were to adopt that theory, we do not believe plaintiffs can reach a determination of unlawfulness under the ADA by proving only the existence of a "100% healed" policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination.

*Id.* at 195; *see also Hughes*, 2021 WL 3008755, at *8. Continuing our discussion of the circuit court's analysis, we noted:

> [T]he circuit court then turned to Kentucky's Civil Rights Act, KRS Chapter 344 (the KCRA), which provides:
>
> > It is an unlawful practice for an employer:
> >
> > > (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of

---

[4] Our jurisprudence often interprets the Kentucky Civil Rights Act ("KCRA," KRS 344.010 *et seq*.) consistently with Title VII because the KCRA largely tracks Title VII. However, the KCRA expressly provides broader relief than found on the face of the federal statute, "including damages for humiliation, personal indignity and other intangible injuries." *See Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95, 105 (Ky. App. 2000).

employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking[.]

KRS 344.040(1). KRS 344.030(1), in turn, defines a "qualified individual with a disability" as:

[A]n individual with a disability as defined in KRS 344.010 who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's disability without undue hardship on the conduct of the employers' [sic] business. Consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job[.]

Based upon this statutory language, this Court detailed the *prima facie* case a plaintiff must demonstrate to establish a claim for disability discrimination under the KCRA:

In order to establish a *prima facie* case of discrimination based on a disability, the plaintiff must show: (1) that he had a

-11-

disability as that term is used under the statute (i.e., the Kentucky Civil Rights Act in this case); (2) that he was "otherwise qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability.

*Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004).

Here, the circuit court concluded that, even if the policies were *per se* discriminatory, the assessment would require it to determine whether every class member was a qualified individual under the KCRA and thus eligible for its protection. This determination, the court stated, was too individualized and divergent for class certification to be appropriate. . . . The need to analyze each proposed class member to ensure that each person is a qualified individual with a disability is too burdensome for class certification. . . . [T]he typicality and adequacy elements fail, also based upon the need that each class member must be a qualified individual with a disability.

*Id*. at *8-9.

To summarize, Hughes had believed (and had attempted to specify in her second amended complaint) that she had asserted a discrimination-based class action founded upon KRS Chapter 344 that effectively skirted any requirement of demonstrating she or anyone else was a "qualified individual with a disability" within the meaning of KRS 344.030(1). But, we agreed with the circuit court's assessment of what she had alleged in her complaint: even if the policies Hughes

took issue with were *per se* discriminatory, that fact alone would be irrelevant unless it was proven that the policies in question were applied to a "qualified individual with a disability" within the meaning of KRS 344.030(1). Thus, despite her creativity in pleading them, each of the claims in this "class" required such an individualized showing to be actionable.

*That* was how the circuit court interpreted and defined the parameters of Hughes' KRS Chapter 344 and "common law" claims set forth in her complaint – as, at most, disability discrimination claims. It was a generous albeit reasonable interpretation of her complaint. And *that* was how we likewise interpreted and defined those claims – notwithstanding Hughes' novel suggestion, posed during the prior appeal, that her claims could also have been based solely upon UPS's "*per se* violations" of three additional statutes, *i.e.*, KRS 311.560, KRS 336.700, and KRS 344.280. *Id*. at \*9. Rejecting that contention, we explained:

> [A]s UPS argued in its brief, Hughes "never articulated a standalone claim under these three statutes" between October 2007 and December 2019. Our review of the voluminous record uncovered very little mention of any of these statutes; we noted these mentions above. These brief mentions were certainly not enough to permit Hughes to make these alleged statutory violations the heart of her appellate argument and escape the application of *Hohider*.

*Id*.

As stated, following our decision in *Hughes*, 2021 WL 3008755, Hughes never filed another amended complaint to expand upon this claim. Nevertheless, during the mid- and post-trial directed verdict hearings that respectively took place on May 24 and May 25, 2023, and in response to UPS's argument that her claim warranted dismissal due to her failure to prove she was a "qualified individual with a disability" per KRS 344.030(1), she insisted that she was not required to make such a showing because her *claims* were not based upon KRS 344.040. This time, she argued her claims – which now included additional "retaliation claims" that she had never asserted in any complaint – were based upon KRS 207.150, KRS 207.170, KRS 336.700, and KRS 344.280; and that she had abandoned a "KRS 311.560 claim" that she had likewise never asserted in any complaint.

At the mid-trial directed verdict hearing, in response to Hughes' characterization of her claims, UPS argued:

> With respect to the [KRS] 207 claim, whether it's [KRS] 344 or [KRS] 207, both of them require, explicitly, that the individual be able to perform the function of the job for which they were hired. Ms. Hughes was not able to do that. So, whether it's [KRS] 207, whether it's [KRS] 344, the admissions made by plaintiff in this case established that she could not prove a claim, and there's no need for that claim to move forward.
>
> With respect to retaliation, what I hear [plaintiff] arguing is that there was some type of retaliation based upon the filing of the EEOC charge. But, everything that occurred

had already occurred by the time the EEOC charge had been filed. This occurred, she was told in March of 2006 that she was not able to come back to work. And so, there's nothing that the EEOC charge could or could not have done with respect to the decisions that were relevant to this case.

*See* Video Record (VR), May 24, 2025, at 3:26:00-3:26:53. After being so advised, the circuit court then explained as follows:

I see two things. I've allowed the parties to kind of muddy the waters for years, that's on the court, but now that I've heard the plaintiff's case-in-chief, that chapter is over. This is an employment discrimination claim, and it's two things and only two things. Either that *Ms. Hughes was discriminated against and terminated because of her alleged disability*, and *a retaliation claim under the statute.* That's it.[5] So, in reverse order, in the light most favorable to the plaintiff, she definitely has the facts to support a retaliation claim. What you just said last was what happened in the Spring of 2006 is what the evidence suggests, but she wasn't actually *terminated* until the Spring of 2007. So, there's a year there, the jury could conclude, well, we don't know. That's why I want to hear your case-in-chief on retaliation.

---

[5] In her brief before this Court, and citing this portion of the video record, Hughes asserts: "The Trial Court held 'she definitely has the facts to support a retaliation claim,' and reserved on 'disability discrimination.' The Trial Court was *otherwise silent on the balance of Ms. Hughes' legal theories*." App. Brief at 17 (emphasis added).

But, the circuit court clearly was not "silent on the balance of Ms. Hughes' legal theories." It stated, "This is an employment discrimination claim, and it's two things and only two things. Either that Ms. Hughes was discriminated against and terminated because of her alleged disability, and a retaliation claim under the statute. *That's it*." (Emphasis added.) In so doing, the circuit court's meaning was plain: it held those were the *only* legal theories or claims Hughes effectively asserted in this matter.

-15-

With regard to the underlying discrimination claim, there is no question in this court's view *this is a Chapter 344 discrimination claim* in spite of how hard we've tried to posture it other ways. So, I would invite your attention to a very recent case in this genre, I don't know if you're familiar with it or not, it's *Norton Healthcare v. Donna Disselkamp*,[6] authored by the Chief Justice in May of 2020, three years ago this month. I'm gonna reserve on your directed verdict motion with regard to whether or not, here's the issue. The plaintiff may not have proven a *prima facie* case for *disability discrimination*.

. . .

So, I'm going to reserve on your directed motion for whether or not I decide or the jury decides the *prima facie* case with regard to *disability discrimination*, and I want to hear your case-in-chief before I do that. With regard to the retaliation claims, I'm denying it. At this point, there's enough, you're welcome to revisit it tomorrow after I hear your case, but that's where we are.

. . .

With regard to retaliation, I definitely see a factual dispute there, at least at this point in the light most favorable to the plaintiff. If that happened in March of '06, why did it take until March of '07 to get there? And the evidence is very clear that she did, asserted both the EEOC claims, she filed for other benefits in that period of time, she did other things that are protected under a *prima facie* case for retaliation. So that's my ruling at this point.

VR, May 24, 2025 at 3:27:00-3:31:30 (emphasis added).

---

[6] This was a reference to *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696 (Ky. 2020).

In short, the circuit court clarified that the only "claims" Hughes effectively asserted in this matter were: (1) a KRS Chapter 344 disability discrimination claim; and (2) "a retaliation claim under the statute," premised specifically on the notion that *she* may have been *terminated* for engaging in "protected activity" (*i.e.*, filing EEOC claims, filing for "other benefits," and doing "other things") between March of 2006 and when she was ultimately terminated in the Spring of 2007. Relative to the latter claim, how the circuit used the word "terminated" should be obvious but is necessary to delineate:[7] Its statements that "she wasn't actually terminated until the Spring of 2007," and, "If [the decisions that were relevant to this case] happened in March of '06, why did it take until March of '07 to get there?" leave no doubt that the circuit court was referencing the *termination* of Ms. Hughes' *employment* in the Spring of 2007.

The next day, after close of evidence, during the directed verdict hearing, the circuit court further refined its understanding of Hughes' claims. Hughes began the hearing by insisting she was entitled to a directed verdict on the KRS 207.150, KRS 207.170, KRS 336.700, and KRS 344.280 "discrimination claims" she had "asserted" because, in her view, UPS had failed to rebut her evidence. UPS responded and cross-moved for a directed verdict, arguing Hughes had only asserted a KRS Chapter 344 disability discrimination claim; and that her

---

[7] *See* n.41.

-17-

failure to adduce evidence demonstrating she was a "qualified individual with a disability" doomed that claim.

With respect to Hughes' "retaliation claim," UPS likewise moved for a directed verdict. It reminded the circuit court that Hughes had never asserted any such claim in any of her complaints. UPS also argued its decisions not to permit Hughes to return to work, and to ultimately terminate her employment, were not temporally close or related to her engagement in any protected activity, but rather upon: (1) her permanent inability to perform an essential function of her job, which had caused Hughes to be on personal leave in excess of twelve months; and (2) its administrative separation policy in effect prior to when Hughes took leave in 2006 (*e.g.*, its "12 Month Leave Policy").

In response to the parties' motions, the circuit court then held as follows:

> This court finds that Ms. Hughes has not proven a *prima facie* case with regard to disability discrimination, specifically finding that she is not a "qualified individual with a disability" essentially because she cannot perform the essential functions of the job, based on her direct evidence and her own testimony here at trial and in my presence. So that's my ruling with regard to disability discrimination and I'm granting a directed verdict on that.
>
> However, with regard to retaliation, the court is going to effectively accept, if it's required, an amendment to the pleadings to assert, on behalf of the plaintiff, a retaliation claim. I do think that, and I'm denying on the retaliation

claim, for this reason. It's been over the course that I've known this case, which is as long as I've been a judge, we've been going back and forth about what it is and what it isn't. And it's abundantly clear to the court that it was effectively two things. As you've been inviting me to review what happened in federal court, and various times when it was attempted to be removed, that the case was apparently, colloquially, just a discrimination case. I was told that was said, I accept that. And I've watched the proof. And what is abundantly clear to the court is that there's a jury question with regard, I do think she has proven up a *prima facie* case with regard to retaliation. For the record, let me recite that. That she was engaged in a protected activity, that the defendant knew of this protected activity, an adverse action was subsequently taken against her, i.e., she was terminated in this case, and there was a causal connection between the protected activity and the adverse employment action, which was a termination.

In this case, there's a jury question, in this court's view, and I intend to submit it to them, to the jury, on retaliation.

VR, May 25, 2025, at 12:08:35-12:10:35.

By and through counsel, Hughes then asked the circuit court: "It sounded like you were inviting the plaintiff to make a rule CR 15.02[8] motion to

---

[8] In full, Kentucky Rule of Civil Procedure (CR) 15.02 provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleading as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the

amend the pleadings to comply with the evidence and we'll do so orally at this time," to which the circuit court responded, over UPS's objection, "I'll accept that."[9]  Hughes did not file a new amended complaint, or otherwise crystallize her understanding of the CR 15.02 "amendment" the circuit court had given her leave to make or the "issues" that amendment permitted her to raise.  She did not seek leave to assert any additional claims beyond what the circuit court had given her leave to assert.  Rather, she permitted the circuit court to define the "retaliation claim" it had given her leave to assert by allowing the circuit court to accept – without objection[10] – the following set of jury instructions regarding that claim:

---

presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that admission of such evidence would prejudice him in maintaining his action or defense upon the merits.  The court may grant a continuance to enable the objecting party to meet such evidence.

[9] *See* VR, May 25, 2025 at 12:11:52-12:12:03.

[10] After discussing the jury instruction set forth above during the May 25, 2023 hearing, the circuit court asked the parties if they objected to it, and Hughes made no objection.  *See* VR, May 25, 2025 at 12:11:52 – 12:12:03.  Despite that, Hughes now contends the jury instruction was deficient because, in her view, it did not encompass *other* claims apart from what we have outlined above, which she believes she effectively asserted in this matter.  As to how she asserted those other claims and thus preserved her "objection" to the jury instructions, she notes that on January 23, 2023 – well before the circuit court permitted her to amend her pleadings to assert a retaliation claim – she filed proposed jury instructions that encompassed what she regarded at that time as her "discrimination claims" and "retaliation claims"; and that those claims, as she described them in her jury instructions, were far broader than the ones that the circuit court described in its directed verdict rulings or the jury instructions it ultimately accepted.  *See* App. Brief at 19.

Hughes is incorrect.  Claims are not asserted by filing proposed jury instructions.  They are asserted through complaints and amendments thereto.  Furthermore, jury instructions "must not be broader than the pleadings, and if not within the issues made by the pleadings are erroneous." *Murphy v. Cordle*, 303 Ky. 229, 197 S.W.2d 242, 244 (1946).  Here, we have set

-20-

## DEFINITIONS

As used in these Instructions, the following term is defined as:

"Protected Activity" means an activity that an employee is legally permitted to do, such as filing a complaint with a governmental agency like the Equal Employment Opportunity Commission.

## INSTRUCTION NO. 1 – MS. HUGHES' CLAIM FOR RETALIATION

Ms. Hughes has brought a claim for retaliation against UPS. You will find for Ms. Hughes if you are satisfied from the evidence that:

> 1. Ms. Hughes was engaged in a protected activity, as defined in these instructions;
>
> 2. UPS was aware of Ms. Hughes' engagement in a protected activity at the time the decision to terminate her was made;
>
> 3. And there was a causal connection between Ms. Hughes' termination and her engagement in a protected activity.

As indicated, the jury unanimously found in favor of UPS regarding Hughes' retaliation claim. Hughes now argues the circuit court erroneously granted UPS a directed verdict regarding her discrimination claim; that she was

---

forth the *only* claims and issues discernable from Hughes' operative complaint and the limited amendment she made to that complaint pursuant to CR 15.02. It would have been error for the circuit court to have instructed the jury consistently with Hughes' proposed jury instructions because her instructions treated the claims she actually asserted in her pleadings far more broadly.

entitled to directed verdicts on both her "discrimination claims" and "retaliation claims"; or, alternatively, that she is entitled to a new trial regarding those claims due to various alleged evidentiary errors. Accordingly, we will continue our analysis by addressing the following overarching issues: (A) whether the circuit court properly directed a verdict in favor of UPS regarding Hughes' discrimination claim; (B) whether Hughes was entitled to a directed verdict regarding her retaliation claim; (C) whether any evidentiary errors warrant a new trial; and (D) the extent to which our analysis moots any remaining aspects of these appeals.

**A. Whether the circuit court properly directed a verdict in favor of UPS regarding Hughes' discrimination claim**.

Hughes now presents three varieties of "discrimination claims" for our review, asserting: (1) UPS unlawfully discriminated against her because it had discriminatory policies; (2) UPS unlawfully discriminated against her because she either opposed its policies or because she engaged in protected activities; and (3) UPS unlawfully discriminated against her because of her disability. She argues the circuit court erroneously directed verdicts in favor of UPS regarding all three varieties of these claims. We will address them in turn.

When considering a motion for directed verdict, "the trial judge must draw all fair and reasonable inferences . . . in favor of the party opposing the motion." *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky. 1998). A directed verdict may only be granted if "there is a complete absence of proof on a material issue or

if no disputed issues of fact exist upon which reasonable minds could differ." *Id*. at 18-19. Also, "[a] directed verdict is appropriate when, drawing all inferences in favor of the nonmoving party, a reasonable jury could only conclude that the moving party was entitled to a verdict." *Buchholtz v. Dugan*, 977 S.W.2d 24, 26 (Ky. App. 1998).

Upon appellate review, this Court "must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party." *Bierman*, 967 S.W. 2d at 18 (citation omitted). Giving deference to the trial court who heard and considered the evidence, a reviewing court cannot substitute its judgment for that of the trial judge unless the trial judge was completely erroneous. *Davis v. Graviss*, 672 S.W.2d 928 (Ky. 1984), *overruled on other grounds by Savage v. Three Rivers Med Ctr.*, 390 S.W.3d 104 (Ky. 2012). Moreover, this Court "may affirm a lower court's decision on other grounds as long as the lower court reached the correct result." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009).

1. Standing alone, the fact that UPS may have had discriminatory policies or practices is (still) not a cognizable claim.

In line with what she argued in *Hughes*, 2021 WL 3008755, Hughes asserts that because UPS instituted what she terms a "100% Healthy Leave Policy" and "12 Month Leave Policy" – policies she believes *could* discriminate against UPS's disabled employees – UPS committed *per se* violations of the FMLA and

-23-

ADA (federal legislation under which, as set forth in her operative complaint, Hughes expressly disclaimed she was asserting any claims). Regarding the FMLA, she argues UPS is liable to her for damages because the FMLA generally requires employers to restore employees who take medical leave to their positions following leave; and because, due to its policies or practices, UPS failed to do so for her. Regarding the ADA, she asserts UPS is liable to her for damages because, due to its policies or practices, it failed to initiate and provide her an "interactive process" to discern whether she could perform her job with reasonable accommodation. For purposes of these "claims," she once again insists it was irrelevant whether she was a "qualified individual with a disability" within the meaning of KRS 344.030(1). Instead, she characterizes these supposed violations of the FMLA and ADA as, in turn, *per se* violations of KRS 336.700(2), which provides:

> Notwithstanding any provision of the Kentucky Revised Statutes to the contrary and except as provided in subsection (3) of this section, no employer shall require as a condition or precondition of employment that any employee or person seeking employment waive or otherwise diminish any existing or future claim, right, or benefit to which the employee or person seeking employment would otherwise be entitled under any provision of the Kentucky Revised Statutes or any federal law.

However, Hughes once again presents no authority favoring her position that a discriminatory policy or practice, standing alone, can form the basis

-24-

of an actionable discrimination claim. Furthermore, the law is to the contrary.

Any claim under KRS 336.700 must be predicated upon the existence of, and

interference with, a right to take some action without employment-related

consequences. *See, e.g.*, *McCown v. Gray Kentucky Television, Inc.*, 295 S.W.3d

116, 119 (Ky. App. 2008) (upholding directed verdict on KRS 336.700 wrongful

termination claim where the plaintiff "failed to correctly identify any right clearly

granted by statute or constitution which would be waived" by signing the

employment release); *see also* KRS 446.070 (providing in relevant part that "A

person injured by the violation of any statute may recover from the offender such

damages as he sustained by reason of the violation[.]"). And, the FMLA does *not*

require employers to restore employees to their positions following leave if the

returning employee "is unable to perform an essential function of the position[.]"

*See* 29 Code of Federal Regulations (C.F.R.) § 825.216(c).[11]

---

[11] In a similar vein, Hughes also argues: "The evidence showed that UPS refused to comply with its own written policies requiring it to return Ms. Hughes to her job at the end of her FMLA leave." Hughes Reply/Cross-Appellee Br. at 23. In support, she cites page 6061 of the appellate record (page 31 of UPS's "Working Together" employee handbook, introduced as an exhibit at trial). But, Hughes does not explain how this cited policy meaningfully differed from – or provided her greater rights than – the FMLA. Nor did it. The cited policy provides:

**Job, Benefit and Wage Protection**

Under the FMLA, you will be returned to the same or equivalent job with equivalent pay and benefits upon completion of your leave. UPS SCS will maintain your current level of health care for the duration of your leave provided you continue to pay your share of the cost of this coverage (where applicable). You will receive a direct bill and payments will be due monthly.

The "right" Hughes identifies under the ADA also required her to prove she was a qualified individual with a disability. As recently explained in *Smith v. Newport*, 129 F.4th 944 (6th Cir. 2025),

> If an employee with a disability requests a change to work duties, a regulation suggests that an employer should "initiate an informal, interactive process" to identify "the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Although the ADA itself does not contain this requirement, we have held that employers must interact in good faith. *See Kleiber*, 485 F.3d at 871.[12] Yet we have added that the failure to discuss accommodations does not qualify as a standalone ADA violation. *See Ford*, 782 F.3d at 766.[13] Rather, employees must show that the discussions would have

---

If you do not return to work at the completion of your leave, you may be required to reimburse the company for expenses the company has incurred for the maintenance of your benefits during the leave period.

**Returning to Work**

In some cases of personal illness or injury, you may be required to provide a fitness-for-duty certification before returning to work.

If, at any time during a leave, you determine that you will not be returning to work upon the expiration of the designated leave period, you must advise your supervisor or manager as soon as possible preferably in writing.

An employee who fraudulently obtains FMLA leave is not protected under the reinstatement provisions of the Act.

Leave regulations may vary somewhat from state to state. If you have questions regarding the FMLA or your eligibility, please contact your supervisor or manager.

[12] *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007).

[13] *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015).

revealed a plausible reasonable accommodation that the employer overlooked. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 331-32 (6th Cir. 2023). And if an employee's formal lawsuit has failed to reveal any reasonable accommodations, those informal discussions would not have done so either. We thus refuse to hold an employer liable for failing to interact with the employee before the litigation unless the employee identifies a valid reasonable accommodation during the litigation. *See Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017).

*Id*. at 953.

Accordingly, what Hughes asserts were UPS's violations of KRS 336.700(2), the FMLA, and the ADA have never constituted standalone claims of any variety. At best, they were merely a facet of Hughes' disability discrimination claim – and a wholly irrelevant facet if Hughes failed to demonstrate she was a qualified individual with a disability within the meaning of KRS 344.030(1). We will revisit this point at the conclusion of our analysis of Hughes' disability discrimination claim.

2. Hughes' assertions that UPS unlawfully discriminated against her because she either opposed its policies or because she engaged in protected activities are not relevant.

Hughes argues the circuit court erred in directing a verdict with respect to her "discrimination claims" because, for purposes of KRS 207.170 and KRS 344.280, there is no requirement for a plaintiff to demonstrate he or she is a "qualified individual with a disability" within the meaning of KRS 344.030(1). To

the contrary, all that is required for purposes of those statutes is a showing that the employer discriminated against the employee for opposing practices prohibited by those statutes, or for participating in proceedings authorized by those respective chapters of the KRS.

Hughes' interpretation of those statutes is correct. *See* KRS 344.280(1); KRS 207.170(1). The problem is that those statutes address *unlawful retaliation* claims. *See, e.g.*, *Kentucky Dep't of Corrs. v. McCullough*, 123 S.W.3d 130, 133-34 (Ky. 2003) (citing KRS 344.280(1), which provides it is an unlawful practice for any employer "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this chapter," as the basis of a claim for unlawful retaliation in Kentucky). Neither statute has any bearing upon whether the circuit court erred in dismissing her *disability discrimination* claim. They are irrelevant to this part of our analysis.

3. Hughes failed to demonstrate UPS unlawfully discriminated against her because of her disability.

KRS 344.040(1)(a) makes it "an unlawful practice for an employer: To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, . . . because the person is a qualified individual with a

-28-

disability[.]" To establish a *prima facie* case of disability discrimination, and thus survive a directed verdict motion, a plaintiff must show: (1) that she had a disability within the meaning of KRS 344.010(4); (2) that, despite the disability, she was otherwise qualified to perform the essential functions of the job in question, either with or without reasonable accommodation; (3) that she suffered an adverse employment action because of her disability; and (4) that she was replaced by a non-disabled person or that similarly- situated, non-disabled employees were treated more favorably. *See, e.g.*, *Bd. of Regents of N. Ky. Univ. v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016). Relative to the second of those elements, the plaintiff bears the burden of demonstrating any proposed "accommodation" is objectively reasonable. *See Noel*, 53 S.W.3d at 104.

As indicated, the circuit court found the second of the above-stated elements dispositive in granting UPS a directed verdict regarding the claim (or claims) of disability discrimination Hughes asserted against that entity. It determined no reasonable juror could find Hughes was able, with reasonable accommodation, to perform at least one essential function of the "warehouse associate" job that Hughes had been hired to do: lifting more than ten pounds.

Hughes argues the circuit court erred in granting UPS a directed verdict, and for two reasons (apart from those addressed above). First, she offers an additional reason for why, in her view, it was irrelevant whether she was able to

perform essential functions of her job with or without reasonable accommodation per KRS 344.030(1): Hughes asserts she premised her disability discrimination claims upon KRS 207.150, not KRS 344.040. Second, Hughes contends that even if KRS 344.030(1) was relevant, she produced "ample evidence" that lifting more than ten pounds was not an essential function of the "warehouse associate" position.

We begin with her second contention. To that point, Hughes notes she testified at trial that UPS did not provide her a written description of the "warehouse associate" position and its essential requirements when she was hired.[14,15] Hughes notes that both she – and her "human resources expert," Nancye Combs – testified that when she sought to return to work in March 2006, she

---

[14] On pp. 1-2 of her brief, Hughes emphasizes that as part of her trial evidence, she introduced Plaintiff's Exhibit 6, which was a "job description" document that UPS provided her in March 2006, relating to the warehouse associate position; and that in reference to that document, she testified, "It was something that I could never do. And probably half the employees there, or more than half, couldn't do." To be clear, however, the "it" that Hughes testified she and those other unidentified employees "couldn't do" was *not* a reference to lifting over ten pounds; nor did Hughes introduce that document to demonstrate that she had no knowledge that lifting over ten pounds was an essential requirement of the warehouse associate position. Rather, the "it" was a reference to regularly lifting up to *seventy* pounds – what the document specified was an essential requirement of the "warehouse associate" position.

[15] Hughes also cites a document located at p. 4593 in the record entitled, "UPS Supply Chain Solutions Essential Job Functions (2008)," which she attached to a summary judgment response she filed in this matter on May 9, 2022. Quoting this document, Hughes asserts "UPS admitted the generalized job duties for a warehouse employee 'vary greatly depending upon the size and location of the . . . facility . . . [and] employees may not perform all of the essential job functions listed above.'" However, Hughes provides no indication that this document was ever introduced as evidence at trial; nor does she indicate how this document from 2008 is relevant to her termination that occurred in 2007.

-30-

remained able to perform the job she had been performing immediately prior to when she took her leave of absence in January 2006. She notes that from September 2002 through October 2005, during times when she had similar lifting restrictions, UPS gave her favorable "employee performance appraisals." Lastly, she claims UPS effectively admitted she maintained the ability to perform the "warehouse associate" job because, in August 2006, UPS denied her claim for short-term disability under an Employee Retirement Income Security Act (ERISA)-governed employee benefit plan.

We disagree. Hughes cites no authority – and we are aware of none – supporting that the denial of short-term disability under an ERISA-governed employee benefit plan qualifies as evidence or otherwise estops an employer from contesting that an employee can perform the essential requirements of a given job for purposes of a disability discrimination claim. As for the remainder of what Hughes presents, it is true that Hughes submitted evidence supporting that when her three-month leave-of-absence ended and she was released to work with restrictions on March 8, 2006, she remained able to perform the same "warehouse associate" job that she had been performing prior to when she took her leave in January 2006. Specifically, her post-March 8, 2006 medical restrictions prohibited her – *permanently* – from lifting more than ten pounds and working overtime. But, for part of 2003, she had been *temporarily* restricted from lifting more than twenty

pounds; for part of 2005, she had been *temporarily* restricted from lifting more than ten pounds and from working overtime; and, during 2003 and 2005, UPS had indeed *accommodated* those restrictions.

With that in mind, the unifying thesis of Hughes' discrimination claims is her assumption that UPS was obligated to "accommodate" her post-March 8, 2006 medical restrictions by permitting her to return to her former accommodated "warehouse associate" job; and that by refusing to do so, UPS unlawfully discriminated against her. However, the evidence adduced at trial demonstrated that the "warehouse associate" job Hughes had been performing prior to her leave was not the *actual* job – or a *reasonably* accommodated iteration of the job – that UPS had hired her to do. Rather, it was a job that UPS had "accommodated" for Hughes by removing one of its essential requirements: Lifting more than ten pounds. Further, Hughes was aware at all relevant times that her "accommodated" job could not accommodate *permanent* restrictions.

The salient evidence regarding the essential functions of UPS's "warehouse associate" job came from Hughes herself. At trial, she testified UPS had many different customers, each with dedicated "lines" in the warehouse, and that management would assign warehouse associates to different lines as needed based on volume and customer demand. When Hughes first began working for UPS, she was assigned to work on a line dedicated to a company that sold

computer items. She would regularly lift, audit, pack, and ship items that weighed an average of *twenty* pounds.[16] When Hughes' doctors later issued her a succession of temporary lifting restrictions, UPS then placed Hughes on three other lines over the course of the next two or three years of her employment. First, it assigned her to a line dedicated to Jockey undergarments. Hughes testified that in that location she mainly audited and packed underwear products that weighed an average of five to ten pounds. UPS then assigned her to a line that required her to "put little kits together that you would hook up to your personal or work computer," which weighed an average of three pounds. UPS then assigned her to a line dedicated to credit card machines that, she testified, weighed an average of five pounds. Hughes testified she would receive assistance from her co-workers if anything in those locations was too heavy for her to lift, and that UPS "was okay with that."[17]

Notwithstanding, Hughes admitted UPS had only been willing to accommodate her lifting restrictions so long as they were *temporary*:

> COUNSEL: If Jennie Davis[18] had allowed you to return
> to work with a permanent ten-pound lifting restriction,
> then you would be working in a warehouse without doing
> any lifting, correct?

---

[16] *See* VR, May 23, 2023 at 11:12:28-11:12:55.

[17] *Id*. at 11:15:05-11:15:14.

[18] Jennie Davis was UPS's human resources representative who maintained contact with Hughes regarding her bid to return to work following leave.

HUGHES: Yes.

COUNSEL: And if you weren't doing that lifting, then
the other people you worked with, your co-workers,
would have to do that heavy lifting for you in addition to
doing their own jobs, correct?

HUGHES: No, because I was put in positions where the
job didn't require me to.

COUNSEL: Well, now in your application for social
security disability benefits, I believe you actually told the
social security office that the way UPS was able to help
you in the past was by giving you help, correct?[19]
HUGHES: Yes.

---

[19] In *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376 (6th Cir. 1998), it was generally recognized
that while statements contained in a claimant's application for disability benefits through either
Social Security are not dispositive of any issue relating to the ADA, they are considered to be
rebuttable evidence:

> The point here is a simple one: When employees (and/or their physicians)
> represent that they are 'totally disabled,' 'wholly unable to work,' or some other
> variant to the same effect, employers and factfinders are entitled to take them at
> their word; and, such representations are relevant evidence of the extent of a
> plaintiff's disability, upon which an employer may rely in attempting to establish
> that an ADA plaintiff is not a 'qualified individual with a disability.' At the same
> time, because the SSA's [Social Security Administration's] definition of disability
> – as well as those of most disability insurance plans – differs materially from the
> ADA's definition of a 'qualified individual with a disability,' these
> representations are not conclusive as to the ADA issue. When a defendant in an
> ADA action relies on such representations as the basis for contending that a
> plaintiff is not a 'qualified individual,' the plaintiff is free to come forward with
> additional evidence that shows she could perform the essential duties of a desired
> position with or without reasonable accommodation notwithstanding the fact that
> she might have been deemed disabled under some other statutory or contractual
> framework. . . . As a general matter . . . absent some such affirmative showing
> . . . the employer will be entitled to judgment as a matter of law.

*Id.* at 383 (footnote omitted) (citing *Weigel v. Target Stores*, 122 F.3d 461, 467-68 (7th Cir.
1997)).

COUNSEL: Right. And who was it giving you that help? It was your coworkers, correct?

HUGHES: Right.

COUNSEL: So, they were doing their jobs and they were also helping you do your lifting, correct?

HUGHES: Well again, like I stated, I was given positions that didn't require any heavy lifting.

COUNSEL: Well, I'm looking at your application here, and you write, "I had help moving the pallets and lifting the heavy packages on my line."

HUGHES: Yes.

COUNSEL: Lifting was a regular part of the job duties of a warehouse associate, correct?

HUGHES: Yes.

COUNSEL: And you understood that when you were hired, correct?

HUGHES: Yes.

COUNSEL: And that's why you needed to bring in these doctor's notes, because without them you would have been required to lift?

HUGHES: Yes.

COUNSEL: Lots of different customers were storing and shipping products in that Elizabethtown warehouse, correct?

HUGHES: Yes.

COUNSEL: Some of them shipped large, heavy products, correct?

HUGHES: Yes.

*See* VR, May 23, 2023, at 1:27:23-1:29:38.

COUNSEL: Do you recall Canin Dog Food shipping at that time?

HUGHES: I remember the dog food, yes.

COUNSEL: Large, heavy bags of dog food were shipped through the warehouse, correct?

HUGHES: Yes.

COUNSEL: And the warehouse associates had to lift those packages and transport them through the warehouse, correct?

HUGHES: Yes.

COUNSEL: And the needs of the customers, the volume of the products being shipped at any time, that changed, correct?

HUGHES: Yes.

COUNSEL: Sometimes one customer was very busy, sometimes a different customer was very busy.

HUGHES: Yes.

COUNSEL: And so, your job required some versatility on your behalf, correct? To meet those different companies' demands?

HUGHES: Yes.

COUNSEL: Right. And that's, in fact, exactly what was written in your performance evaluation of March 9, 2003. "We appreciate and rely on her versatility as our demands change." Correct?

HUGHES: Mm-hm. Yes.

COUNSEL: Now, throughout your employment with UPS, you brought in lots of different doctor's notes, correct?

HUGHES: Yes.

COUNSEL: And UPS always tried to work with you, didn't they?

HUGHES: Yes.

*Id*. at 1:29:50-1:31:00.

COUNSEL: When UPS worked with your restrictions, you were told that they could not be permanent, correct?

HUGHES: Yes.

COUNSEL: Right. You were told that they could work with you, but it couldn't be permanent because other folks would have to step in and do that lifting for you, and that couldn't go on forever, correct?

HUGHES: Yes.

*Id*. at 1:31:20-1:31:48

In line with Hughes' testimony, Carl Norris, UPS's current area manager – and former "warehouse associate" from 2003 through 2006 at UPS's Elizabethtown warehouse – testified he was also familiar with the essential

functions of the "warehouse associate" position before and during 2006, and that in 2006, the position regularly required lifting more than ten pounds.[20] He worked with Hughes as a warehouse associate and supervised her work as a "lead warehouse associate" between 2001 and 2004; and regularly worked at the same warehouse, albeit not with Hughes, in 2005 and 2006.[21] According to Norris, warehouse associates were cross-trained and often rotated between lines to meet the varying needs of UPS's clients: the type and volume of work at the warehouse on any given day greatly depended upon what the inbound trailers were bringing and what was mostly being shipped out to consumers and retail entities.[22] According to Norris, UPS regularly required everyone to pitch in at the concentration points of those inbound and outbound shipments, which entailed lifting items of varying sizes and weights that often exceeded twenty pounds.[23] Norris acknowledged a single package of Jockey underpants could indeed weigh very little, but that *cases* or *pallets* of Jockey underpants, which warehouse

---

[20] *See* VR, May 24, 2023 at 4:12:05-4:12:22.

[21] *Id*. at 3:54:10-3:54:30; 4:04:56-4:05:42.

[22] *Id*. at 3:43-3:52.

[23] *Id*.

associates on that line would also need to lift and ship every day, could weigh far more than ten pounds.[24]

Considering the warehouse associates regularly received, sorted, and shipped caseloads and pallets of products, and also handled a variety of products that were individually heavy such as car parts and bags of dog food, Norris testified that that regularly lifting in excess of ten pounds was an essential function of the job.[25] He testified that in 2006, there were no warehouse associate positions in UPS's facility that did *not* require, as an essential function of the position, regularly lifting more than ten pounds.[26]

Norris also recalled that in March of 2006, at or near when Hughes sought to return to work, he was asked by the facility's human resources officer at the time, Jennie Davis, if there were any available positions that could accommodate Hughes' permanent medical restrictions (*i.e.*, sitting all day and no lifting more than ten pounds). He testified that some administrative positions in the warehouse could have accommodated them, but none were vacant.[27] As for returning her to employment as a warehouse associate, he testified it was the

---

[24] *Id*. at 3:56:40-3:57:36.

[25] *Id*. at 3:53:20-3:53:30.

[26] *Id*. at 4:12:00-4:12:22.

[27] *Id*. at 3:58:30-3:59:46.

permanence of Hughes' restrictions that could not be accommodated. The primary focuses in accommodating any medical restriction were always (1) the duration of the restriction and (2) whether the restriction impacted an essential function of the job.[28] If the restriction impacted an essential function like lifting but was only temporary, UPS would assign co-workers to provide the necessary assistance and essentially perform "double work";[29] but if it was permanent, it was unfair and unworkable to assign co-workers to provide the necessary assistance forever.[30]

As stated, the second element of a *prima facie* case of disability requires a plaintiff to show that, despite the disability, she was otherwise qualified to perform the essential functions of the job in question, either with or without *reasonable* accommodation. *See Weickgenannt*, 485 S.W.3d at 306. For purposes of a disability discrimination claim, physical qualifications such as the ability to lift can constitute "essential functions" of a position. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). Here, the trial evidence unequivocally demonstrated that lifting greater than ten pounds was an essential function of the warehouse associate position – an essential function that could at most be temporarily accommodated.

---

[28] *Id*. at 3:55:48-3:56:08.

[29] *Id*. at 3:56:12-3:56:42.

[30] *Id*. at 3:57:39-3:58:11.

The only "accommodation" Hughes has ever proposed in this matter to accommodate her *permanent* restriction from lifting more than ten pounds is for UPS to *permanently* return her to the *temporarily* accommodated job she was performing for UPS prior to when she took leave in January 2006. But, *permanently* removing an essential function from her job would have the effect of either creating an entirely new job for her, or of requiring UPS to employ two workers to perform the work of one, neither of which are *reasonable* accommodations. *See Wymer v. JN Properties, Inc.*, 50 S.W.3d 195, 200 (Ky. 2001) ("Reasonable accommodation does not include creating a new job."); *Bratten*, 185 F.3d at 632-33 (explaining employee's requested accommodation of having co-workers perform essential lifting tasks of job was not "reasonable," and that the ADA does not require employers "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of [her] disability."); *see also Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1117 (S.D. Ill. 2001) ("While Eastside did accommodate Williams' temporary condition for two years, the duration of an arrangement to accommodate an employee's temporary condition is not, by itself, sufficient to show that the arrangement was meant to last forever."); *id.* at 1122 n.15 (emphasis omitted) ("[T]o the extent that Williams was requesting to remain on light-duty indefinitely, this was not a request

-41-

for a reasonable accommodation. It is even more doubtful whether the ADA anti-retaliatory provisions would consider requesting unreasonable accommodations as 'protected activity.'").

Having failed to adduce proof of any *reasonable* accommodation for her restriction, Hughes failed to present a *prima facie* case of disability discrimination. This leads to Hughes' remaining argument regarding why, in her view, the circuit court erred in directing a verdict in favor of UPS and dismissing her disability discrimination claims: she contends it was irrelevant whether she was able to perform essential functions of her job with or without reasonable accommodation, per KRS 344.030(1), because, she asserts, she premised her disability discrimination claims upon KRS 207.150, not KRS 344.040.

We disagree. KRS 207.150, part of the Kentucky Equal Opportunities Act[31] (KEOA), was enacted in 1976. It thus predates and – unlike KRS 344.040, which is part of the KCRA[32] – is not patterned off or interpreted consistently with the ADA. Relevant to Hughes' arguments, it provides:

> (1) No employer shall fail or refuse to hire, discharge, or discriminate against any individual with a disability with respect to wages, rates of pay, hours, or other terms and conditions of employment because of the person's physical disability *unless the disability restricts that*

---

[31] *See* KRS 207.130 *et seq.*

[32] *See* KRS 344.010 *et seq.*

*individual's ability to engage in the particular job or occupation for which he or she is eligible . . .*

(Emphasis added.)

Hughes' argument regarding this statute may be summarized as follows: she asserted a claim of "discrimination" against UPS under this provision; KRS 207.150(1) is not KRS 344.040; as such, whether she could perform all essential functions of her warehouse associate position was irrelevant for purposes of her KRS 207.150(1) claim. That said, her argument grossly misapprehends KRS 207.150(1) because it ignores the qualification emphasized above: the statute does *not* prohibit an employer from discharging or refusing to hire an individual with a disability if the person's disability "restricts that individual's ability to engage in the particular job or occupation for which he or she is eligible[.]" *Id.* In turn, and read *in pari materia* with other provisions of the KEOA, a disability that "restricts that individual's ability to engage in the particular job or occupation" means a disability that cannot be "overcome by treatment, medication, appliances, or other rehabilitation[,]"[33] and which prevents

---

[33] *See* KRS 207.140(1) ("Nothing contained in KRS 207.130 to 207.240 shall be construed to prevent an employer from making any preemployment inquiry about the existence of an applicant's disability and about the extent to which that disability has been overcome by treatment, medication, appliances, or other rehabilitation.").

an aggrieved individual from being "fully capable of carrying out the duties of the job which he or she had been denied."[34]

It therefore makes no difference that KRS 207.150(1) is not KRS 344.040 because the requisites of those provisions are not meaningfully different for purposes of this case. Hughes' inability to lift more than ten pounds, which could not be reasonably accommodated, prevented her from being fully capable of carrying out the duties of the job which she had been denied; her inability accordingly restricted her from engaging in that particular job within the meaning of KRS 207.150(1), and was thus reason enough for UPS to discharge or refuse to rehire her without running afoul of either statute.

We now revisit UPS's asserted violations of KRS 336.700(2), the FMLA, and the ADA. As stated, those were merely a facet of Hughes' overarching disability discrimination claim. They were also a wholly irrelevant facet because Hughes failed to demonstrate she was a qualified individual with a disability within the meaning of KRS 344.030(1). The circuit court properly denied Hughes' motion for a directed verdict regarding her "discrimination claims," and properly granted UPS's cross-motion.

---

[34] *See* KRS 207.200(5)(a)-(d).

**B. Whether Hughes was entitled to a directed verdict regarding her retaliation claim.**[35]

While it is possible for a plaintiff to be granted a directed verdict regarding an unlawful retaliation claim, the plaintiff's burden in that regard is heavy. The United States Supreme Court's decision in *McDonnell Douglas*[36] "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The purpose of the *McDonnell Douglas* burden-shifting framework is to "progressively . . . sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981).

At the first stage, the plaintiff bears the burden of establishing a "*prima facie*" case. *Burdine*, 450 U.S. at 252-53. The requirements to establish a

---

[35] UPS argues in its cross-appeal (No. 2023-CA-1187-MR) that it was entitled to a directed verdict regarding Hughes' retaliation claim. But, that kind of argument is properly raised by an appellee as an alternate means of affirming a judgment – not by a cross-appellant whose role is to contest a judgment. *See, e.g.*, *Brown v. Barkley*, 628 S.W.2d 616, 619 (Ky. 1982), explaining:

> If . . . the judgment reflects a jury verdict in favor of the defendant, there is no reason why he cannot argue to the appellate court that certain errors raised on appeal by the losing plaintiff are immaterial because the defendant had moved for and was entitled to a directed verdict anyway. In short, "cross-appeals can be maintained only when the effect of the trial judgment is to place some obligation on appellee" (or, of course, to deny him something for which he has asked).

(Citation omitted.) In any event, considering our disposition of this matter, it unnecessary to address this point.

[36] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*prima facie* case are "minimal," *Hicks*, 509 U.S. at 506, and a plaintiff's burden is therefore "not onerous," *Burdine*, 450 U.S. at 253. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254. At the second *McDonnell Douglas* stage, the presumption created by the *prima facie* case "places upon the defendant the burden of producing an explanation to rebut the *prima facie* case – *i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks*, 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S. at 254).

However, while the presumption "shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 507 (quoting *Burdine*, 450 U.S. at 253). If the defendant satisfies its burden of production, then "the presumption raised by the *prima facie* case is rebutted and drops from the case." *Id.* (internal quotation marks and citation omitted). At the final stage, the plaintiff then has "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision" – a burden that "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43,

(2000) (internal quotation marks omitted) (noting that after the presumption is rebutted the "sole remaining issue [is] discrimination *vel non*.")).

This framework, which was developed in the context of claims for discrimination under Title VII, also applies to claims of retaliation under Title VII. In turn, it applies to claims of retaliation under KRS 344.280. *See Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 583-84 (Ky. 2016). To establish a *prima facie* case, a plaintiff must show: (1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in and the [defendant] employer's act. *Id*. at 583.

Merely *presenting* a *prima facie* case does not warrant a directed verdict even if a defendant fails to rebut it. At the outset, it is important to be clear about the consequences of a defendant's failure to satisfy its burden of production at trial under the second step of *McDonnell Douglas*. As the Supreme Court noted in *Hicks*, "if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a *prima facie* case, and (2) the defendant has failed to meet its burden of production," then the "court must award judgment to the plaintiff as a matter of law." 509 U.S. at 509. However, "[i]f the defendant has failed to sustain its burden but reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a *prima facie* case, then a question of fact does remain, which the trier of fact will be called upon to answer."

*Id*. at 509-10. Accordingly, *disputed* elements of a *prima facie* case must be submitted to a jury even if the defendant fails to carry its burden of production. *See Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 587 (6th Cir. 2002) ("If the parties dispute the facts establishing the prima facie case . . . a question of fact remains for the fact finder to decide.").

The initial question, then, is whether a rational person would *not* have to find the existence of facts constituting Hughes' *prima facie* case of retaliation. As discussed below, we believe a rational person would not have to do so. Hughes' argument on appeal regarding why she was entitled to a directed verdict regarding her "retaliation claims" is as follows:

> She presented direct *prima facie* evidence that UPS retaliated against her because she opposed UPS's: (i) refusal to allow her to return to her protected job at the end of her FMLA leave; (ii) refusal to begin the ADA Process; and (iii) refusal to allow her to return to work with any restrictions. Ms. Hughes also presented direct *prima facie* evidence that UPS retaliated against her for filing her EEOC complaints: (i) refused to begin, and then abandoned, the ADA Process; (ii) changed her leave to personal retroactively resulting in her loss of insurance coverage and corresponding liability for prior paid claims; (iii) denied her short-term, and long-term, disability benefits – a stark contradiction to its refusal to allow her to return to her job.
>
> Ms. Hughes presented direct sufficient *prima facie* evidence that she: (i) engaged in protected activities, including KRS 207.170 and 344.280; (ii) she was disadvantaged – negatively impacted, suffering a mental breakdown and admission for suicide – by UPS'[s]

-48-

retaliatory conduct; and (iii) there was a causal connection between her protected activities and UPS'[s] actions. This causal connection is not high and simply a "but for" standard. *Asbury Univ. v. Powell*, 486 S.W.3d 246 (Ky. 2016).

Notably, the Trial Court expressly found Ms. Hughes presented a *prima facie* case of retaliation under KRS 344.280. There is no dispute that she did so as well under KRS 207.170. UPS'[s] failure to present any rebuttal evidence was fatal to its defense.

App. Brief at 28.

Parenthetically, there are two types of retaliation claims that may be asserted under KRS 207.170 and KRS 344.280. Both statutes contain: (1) an "opposition" clause, which prohibits discrimination or retaliation against an employee because the employee has opposed "any practice made an unfair employment practice by KRS 207.130 to 207.240,"[37] or "a practice declared unlawful by [KRS Chapter 344]";[38] and (2) a "participation" clause, which prohibits discrimination or retaliation against an employee because the employee "has filed a charge, testified, assisted, or participated in any manner in an investigation, citizen's action suit, proceeding, or hearing under KRS 207.130 to 207.240,"[39] or "has made a charge, filed a complaint, testified, assisted, or

---

[37] KRS 207.170(1).

[38] KRS 344.280(1).

[39] KRS 207.170(1).

-49-

participated in any manner in any investigation, proceeding, or hearing under [KRS Chapter 344]."[40]

Here, with its specific references to Hughes' filings of "EEOC claims" in its directed verdict rulings and the jury instructions it accepted below, the circuit court clearly gave Hughes leave to assert a "participation" clause retaliation claim. Taking (generously) the circuit court's allusion to Hughes' doing "other things" that qualified as protected activities, it would appear the circuit court also gave Hughes leave to assert an "opposition" clause retaliation claim.

And Hughes does indeed contend that she presented both varieties of "retaliation claims." Regarding the first variety, she asserts UPS unlawfully retaliated against her because she *opposed practices* of UPS that she believes KRS Chapters 207 and 344 prohibited, to wit, "UPS's: (i) refusal to allow her to return to her protected job at the end of her FMLA leave; (ii) refusal to begin the ADA Process; and (iii) refusal to allow her to return to work with any restrictions." Regarding the second variety of claim, she asserts UPS unlawfully retaliated against her because she *participated in proceedings* she believes fell under the purviews of KRS Chapters 207 and 344, *i.e.*, because she filed "EEOC complaints." With respect to both varieties of "retaliation claims," she also asserts UPS retaliated against her by taking the following actions: "(i) refus[ing] to begin,

---

[40] KRS 344.280(1).

-50-

and then abandon[ing], the ADA Process; (ii) chang[ing] her leave to personal retroactively resulting in her loss of insurance coverage and corresponding liability for prior paid claims; (iii) den[ying] her short-term, and long-term, disability benefits."

That said, Hughes' argument set forth above is largely improper because: (1) it involves "retaliation claims" Hughes never effectively asserted; (2) it is predicated upon activities that cannot be considered "protected activities"; and (3) it omits any discussion of how Hughes' participation in any "protected activities" caused UPS to terminate her employment. We will address these points in turn before (4) proceeding to what is properly before us regarding the retaliation claim she asserted below.

1. Hughes was only given leave to assert UPS retaliated against her by terminating her employment.

Under our civil rules, the device for asserting a cause of action is the complaint. There is a lenient standard – but a standard nonetheless – for ascertaining whether a cause of action has been effectively asserted in a complaint. CR 8.01 requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." And, "It is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the claim." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). Notwithstanding, a

plaintiff may not assert new causes of action during the pendency of the proceeding which were not set out in the complaint unless they are tried by the express or implied consent of the opposing party. *See* CR 15.02; *Traylor Bros., Inc. v. Pound*, 338 S.W.2d 687 (Ky. 1960).

Here, Hughes did not assert a retaliation claim in her complaint. UPS consistently objected to allowing her to assert any such claim. She was only granted leave by the circuit court per CR 15.02 to assert a "retaliation" claim based on the limited premise that UPS retaliated against her by *terminating her employment*. She did not seek leave to amend her complaint to assert any other kind of "retaliation" claim. And, the jury was never instructed to consider any other kind of "retaliation" claim. To be sure, terminating employment is *one* way that an employer may disadvantage an employee for purposes of a retaliation claim. But, it is the *only* way Hughes pled that UPS retaliated against her, and her claim was accordingly limited. *See, e.g.*, *Murphy v. Cordle*, 303 Ky. 229, 197 S.W.2d 242, 244 (1946) ("It will be noted that the instruction is based on a general allegation of negligence whereas the petition alleges a specific act of negligence. Instructions must not be broader than the pleadings, and if not within the issues made by the pleadings are erroneous.").

To the extent Hughes now contends she is entitled to relief regarding "retaliation claims" based on the premises that UPS retaliated against her by "(i)

refus[ing] to begin, and then abandon[ing], the ADA Process; (ii) chang[ing] her

leave to personal retroactively resulting in her loss of insurance coverage and

corresponding liability for prior paid claims; [and] (iii) den[ying] her short-term,

and long-term, disability benefits," those other "claims" were not before the circuit

court and they are not before us.[41] "Proof without pleading will not sustain a cause

of action,"[42] and "[o]ur jurisprudence will not permit an appellant to feed one kettle

of fish to the trial judge and another to the appellate court." *Owens v.*

*Commonwealth*, 512 S.W.3d 1, 15 (Ky. App. 2017) (footnote omitted).

2. Much of what Hughes contends was "protected activity" cannot be considered as such.

     a. Hughes' filing of complaints to the Equal Opportunity Employment Commission and (possibly) the Kentucky Commission on Human Rights was not "protected activity" for purposes of any KRS 207.170 "participation clause" retaliation claim.

     As stated, Hughes premised her unlawful retaliation claims upon KRS

207.170 and KRS 344.280. With respect to the "activity" that is "protected" for

---

[41] In the "factual background" section of her opening brief, Hughes also insinuates UPS "retaliated" against her by means of *three* different types of "termination," namely: (1) "*threatening* her with termination" on August 11, 2006 (App. Brief at 11) (emphasis added); (2) "terminating her *insurance benefits retroactively*" on August 17, 2006, effective March 12, 2006 (*id.*) (emphasis added); and by (3) "terminating her following receipt of the EEOC dismissal" on April 17, 2007 (*id.* at 15). Only the third of those types of "termination" is at issue. As outlined above, Hughes was only given leave to assert a claim that alleged UPS retaliated through its *decision* to *terminate her*.

[42] *Pound*, 338 S.W.2d at 688 (citation omitted).

purposes of a KRS 207.170 "participation clause" retaliation claim, KRS

207.170(1) provides:

> No employer shall discharge, expel, refuse to hire, or
> otherwise discriminate against any person or applicant
> for employment, nor shall any employment agency
> discriminate against any person, nor shall a labor
> organization discriminate against any member or
> applicant for membership because such person has
> opposed any practice made an unfair employment
> practice by KRS 207.130 to 207.240 or *because he has*
> *filed a charge, testified, assisted, or participated in any*
> *manner in an investigation, citizen's action suit,*
> *proceeding, or hearing under KRS 207.130 to 207.240.*

(Emphasis added.)

Hughes argues she engaged in "protected activity" under KRS

207.170 because she filed complaints of disability discrimination with "the EEOC

and state agencies."[43] But as far as we are able to discern from the record, and as

far as her citations to the record disclose, she only filed complaints with the United

States EEOC[44] and *possibly*[45] the Kentucky Commission on Human Rights

---

[43] App. Brief at 27.

[44] *See* Record at 5998.

[45] Hughes filed ADA disability discrimination charges against UPS with the EEOC at the
EEOC's Indianapolis District office in Louisville. *See* Record at 5998. "EEOC Form 5"
documents were the cover sheets of both her July 7 and October 13, 2006 complaints with that
agency. Each EEOC Form 5 also listed the "Kentucky Commission on Human Rights" as the
"State or local Agency, if any"; and at the bottom of each EEOC Form 5, Hughes verified her
charges by signing her name underneath a box that stated, in boilerplate: "I want this charge
filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I
change my address or phone number and I will cooperate fully with them in the processing of my
charge in accordance with their procedures." *See* Record at 5997 and 6022.

(KCHR)[46] – two entities that do *not* conduct investigations, proceedings, or hearings under KRS 207.130 to 207.240.[47] Hughes' filing of those complaints cannot be considered "protected activity" for purposes of any KRS 207.170 "retaliation claim" she asserted.

---

We write that Hughes "possibly" filed discrimination charges with the KCHR because, while she affirmed that she *wanted* her charges to also be filed with the KCHR, there is no indication from the record that they were. The only indicator Hughes provides (and the only indicator we have found of record) regarding how *all* her disability discrimination charges were administratively resolved is her citation to the "right-to-sue" letter she received from the EEOC on April 17, 2007.

[46] *See* Record at 5997.

[47] As noted, the KCRA provides it is unlawful for an employer to "[r]etaliate or discriminate in any manner against a person because . . . he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." KRS 344.280(1). KRS Chapter 344 establishes the KCHR. KRS 344.150. The Commission is empowered, inter alia, to receive and investigate complaints of unlawful practices, to hold hearings regarding those complaints, and to issue various orders relating to its findings. *See* KRS 344.180, 344.200, 344.210, 344.230, 344.250. Similarly, Title VII states that it is unlawful for an employer "to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. Title VII creates the EEOC, which is empowered to accept complaints of unlawful employment discrimination, investigate them, and take various enforcement actions. *See* 42 U.S.C. §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8. The language of the participation clause of the retaliation provisions in both the KCRA and Title VII specifically refer to proceedings and charges made under that particular chapter or subchapter, respectively.

Thus, the KCRA prohibits employers from retaliating against someone for making a complaint to the KCHR or participating in an ensuing investigation authorized under KRS Chapter 344. Title VII prohibits retaliation for similar actions with respect to the EEOC. Because neither entity conducts proceedings under KRS Chapter 207, proceedings conducted by those entities are therefore not "protected activity" encompassed by KRS 207.170(1). KRS Chapter 207 proceedings are either judicial actions, or they are administrative proceedings enforced by the Department of Workplace Standards. *See, e.g.*, KRS 207.200; KRS 207.210; KRS 207.230.

b. Hughes' "opposition" to UPS's "unlawful activity" of "refus[ing] to allow her to return to her protected job at the end of her FMLA leave" and "refus[ing] to allow her to return to work with any restrictions" was not "protected activity" for purposes of her "opposition clause" retaliation claim.[48]

Assuming a plaintiff's taking issue with a singular decision of an employer (*i.e.*, a decision to refuse to allow a specific employee to return to work due to the employee's inability to perform an essential function of the job) qualifies as "opposing" an employer's "practice" for purposes of a retaliation claim, the plaintiff opposing that decision must nevertheless have at least a good faith belief that the "practice" they are opposing is unlawful. If their belief regarding the "unlawfulness" of the "practice" is founded upon an unreasonable mistake of law, their opposition to the "practice" is not protected activity. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012); *see also*

---

[48] Hughes' argument that "UPS retaliated against her because she opposed UPS'[s]: . . . (ii) refusal to begin the ADA Process[,]" and that it retaliated against her *by* "(i) refus[ing] to begin, and then abandon[ing], the ADA Process[,]" defies rational analysis. To begin, she presents nothing indicating she requested UPS to begin the ADA interactive process; rather, it appears she believes she triggered a duty that obligated UPS to begin that process on its own initiative upon its receipt of her permanent restrictions. That aside, Hughes presents no authority suggesting an employer's failure to accommodate an employee's request for an accommodation, in and of itself, qualifies as "retaliation" for requesting an accommodation. *Cf. Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006) (Explaining in the ADA context, "To the extent plaintiff claims that defendant's ongoing failure to accommodate her after May 16, 2003 constituted retaliation, this claim is also insufficient as a matter of law. Requesting accommodation inevitably carries the possibility that the employer will not honor the request. If the prospect that an employer might not honor the request would deter a reasonable employee from even making the request, reasonable employees would not request accommodation. For this reason, a failure to accommodate cannot constitute retaliation for an employee's request for accommodation.").

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (reinstating district court's entry of summary judgment where plaintiff could not have reasonably believed she was opposing an employment practice that violated Title VII); *Asbury Univ. v. Powell*, 486 S.W.3d 246, 252 (Ky. 2016) (requiring the employee have "a reasonable and good faith belief" that the adverse employment practices he opposed were KCRA violations to obtain retaliation protection under KRS 344.280(1)).

Here, consistent with what has been set forth, to the extent Hughes contends UPS's "practice" of refusing to permit individuals who do not fit the criteria of KRS 344.030(1) to return to work violated the ADA, FMLA, KRS 207.150, or KRS 344.040, her belief is founded upon an unreasonable mistake of law, and her "opposition" to that "practice" cannot qualify as "protected activity" for purposes of any retaliation claim.

3. Hughes does not argue a causal connection existed between the "practices" of UPS that she allegedly "opposed" and her termination of employment.

Even if Hughes' alleged "opposition" to UPS's "practices" of "(i) refus[ing] to allow her to return to her protected job at the end of her FMLA leave; (ii) refus[ing] to begin the ADA Process; [and] (iii) refus[ing] to allow her to return to work with any restrictions" constituted "protected activity" within the meaning of KRS 207.170 and KRS 344.280, Hughes offers no argument that UPS

*terminated her employment* because she engaged in those activities.[49]  It is not the responsibility of this Court to construct legal arguments on behalf of an appellant and scour the record to find where it might provide support for her claims, and we will not do so.  *Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012).  To the extent Hughes takes issue with the circuit court's refusal to either direct a verdict in her favor or grant her a new trial regarding her "opposition clause retaliation claims," we accordingly find no error.  *See, e.g.*, *Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000) ("Any part of a judgment appealed from that is not briefed is affirmed as being confessed.").

4. <u>What is properly before us regarding the retaliation claim Hughes asserted does not warrant reversal</u>.

What remains of Hughes' arguments regarding her "retaliation" claims appears in the "statement of facts" of her appellate brief.  There, Hughes asserts:

---

[49] The closest Hughes comes to this premise is the following perfunctory statement set forth on p. 23 of her opening brief:

> UPS conceded it was fully aware of her right to return to her prior job at the end of her FMLA leave.  Yet when Hughes pressed her employment rights – opposing UPS'[s] "100% healthy" rule – UPS retroactively terminated her benefits and placed her on unpaid leave, *effectively* terminating her employment.

(Emphasis added.)  But, beyond filing her EEOC complaints or simply asking UPS for her job back, Hughes does not explain how she otherwise "opposed" UPS's "100% healthy rule" prior to her termination.  Her "opposition" to UPS's refusal to permit her to return to work due to her inability to perform an essential function of her job was not, as discussed, protected activity.  Lastly, when UPS terminated her benefits and placed her on unpaid leave, it did *not* terminate her employment.  It terminated her employment several months later.

**V. UPS retaliates against Ms. Hughes a final time— terminating her following receipt of the EEOC dismissal**.

> Between November 2006 and April 2007, UPS *took no action* with respect to Ms. Hughes' ADA process and right to return to her job. On April 17, 2007, the EEOC issued a dismissal and notice of rights as to both of Ms. Hughes' charges.  The EEOC stated it was *not certifying* UPS was "in compliance with the statutes."  Upon receipt of the EEOC notice, UPS immediately terminated Ms. Hughes.

App. Brief at 15.

Recall, to make a *prima facie* case of retaliation, Hughes was required to show that "(1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in and the [defendant] employer's act."  *Kentucky Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991) (citation omitted).  Here, as noted, Hughes filed discrimination charges with both the EEOC and *possibly* the KCHR, and there can be no dispute that filing charges with the KCHR – as Hughes may have done on July 7 and October 13, 2006 – is protected activity for purposes of KRS 344.280.  Likewise, relative to the second element of her *prima facie* case, there can be no dispute that UPS disadvantaged Hughes by terminating her employment.

But there is a problem regarding the third element. It appears that for purposes of satisfying causation Hughes is relying entirely upon the temporal proximity between when she received her "right-to-sue" letter from the EEOC and when she was terminated by UPS: both events occurred on April 17, 2007. To be sure, when an adverse employment action occurs very close in time after the employer *learns* of a protected activity, temporal proximity alone may be enough to establish the causation element of the *prima facie* case of retaliation. *See McCullough*, 123 S.W.3d at 135; *see also Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer *learns* of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with *other evidence* of retaliatory conduct to establish causality." *Id.* (emphasis added).

Here, Hughes' trial evidence demonstrated UPS *learned* of her July 7, 2006 EEOC complaint, her possible KCHR complaint, and the fact that she had initiated proceedings before those agencies, no later than July 31, 2006.[50] She does not indicate when UPS learned of her October 13, 2006 complaints, but it may be

---

[50] Specifically, Hughes' Exhibit 19 was a July 31, 2006 email from Jennie Davis (a UPS human resources representative) to warehouse manager Carl Norris, asking, "Do you have any e-mails we shared on conversations with Marion Hughes. She has filed an EEOC charge and I need to put together our conversations." *See* Record at 6071.

-60-

presumed UPS was provided notice within ten days afterward.[51]  She does not indicate that she "participated" – or that UPS was aware that she participated – in those proceedings beyond filing those complaints.  And, it is the filing of those complaints that is the "protected activity" – not the issuance of a "right-to-sue" letter from those agencies.  To that point, KRS Chapter 344 is to be interpreted consistently with Title VII; and the United States Supreme Court has explained that for purposes of Title VII, it is an "utterly implausible suggestion that the EEOC's issuance of a right-to-sue letter – an action in which the employee takes no part – is a protected activity of the employee[.]"  *Breeden*, 532 U.S. at 273.

Consequently, the relevant starting date was approximately ten days after October 13, 2006, when UPS presumptively received Hughes' second and final round of administrative discrimination charges; and the relevant ending date was April 17, 2007, when she was terminated.  This temporal gap of almost six months is insufficient to establish a causal connection between the filing and her termination because such a long time period severs any inference of causal connection.  The Kentucky Supreme Court has held that *four* months between the protected activity and an adverse employment action was "too long to create, by

---

[51] As noted, if Hughes filed disability discrimination charges before the EEOC *and* the KCHR, the charges were the same before both entities.  *See* Note 45.  Hughes does not indicate when (if ever) her charges were filed before the KCHR, but Title VII and its implementing regulations require that an employer be given notice of charges within 10 days of filing.  *See* 42 U.S.C. § 2000e-5(b), (e)(1); 29 CFR § 1601.14 (2020).

itself, an inference of causality." *Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 804 (Ky. 2004) (citing *Breeden*, 532 U.S. at 273-74).

In summary: to effectively argue to this Court that she was entitled to a *directed verdict* regarding her retaliation claim against UPS, Hughes was required – at minimum – to demonstrate she presented a *prima facie* case supporting the retaliation claim she asserted. Considering what is set forth above, Hughes has failed to do so. Ample evidence – particularly Hughes' own testimony and admissions – demonstrated UPS was unable to reasonably accommodate her permanent restrictions. UPS had already placed Hughes on personal leave, on that basis, as of March 2006 – when UPS's policy of administrative termination following twelve months of an employee's absence from the job was in effect,[52] and prior to when Hughes had engaged in any alleged protected activity.[53] And, Hughes presents nothing beyond her own speculation and conjecture supporting that UPS ultimately terminated her because she engaged in protected activities, rather than because it was unable to reasonably accommodate her permanent

---

[52] UPS's policy of administratively terminating employees who have been absent from work for greater than 12 months was set forth in its "Working Together" employee handbook, revised on "3/13/06," that was introduced as Plaintiff's Exhibit 15 at trial. *See* Record at 6056.

[53] "When the employer 'proceed[s] along lines previously contemplated,' we must not take the temporal proximity of the adverse employment action as evidence of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014).

restrictions.  Her argument that she was entitled to a directed verdict therefore fails, and we affirm on this point as well.

**C. Whether any evidentiary errors warrant a new trial**.

As detailed below, Hughes alleges the circuit court committed several errors regarding the admission and exclusion of evidence from trial.  We review preserved evidentiary issues for abuse of discretion and will only find error if the trial court's decision was arbitrary, unreasonable, or unsupported by law.  If we find the trial court erred, we then review for whether the error was harmless, or requires reversal because it rendered the trial unjust.  *See Minch v. Commonwealth*, 630 S.W.3d 660, 666-67 (Ky. 2021).

1. The exclusion of UPS's "written leave policies."

There is no dispute that UPS's policies and procedures set forth in its employee handbook, entitled "Working Together," were effective during the relevant events of Hughes' claims.  That handbook was admitted into evidence; it will be discussed in greater depth later in this opinion; and it is not germane to this part of our analysis.  This part of our analysis instead addresses three other purported sources of UPS's internal policies.  At trial, Hughes sought to introduce – and to elicit testimony from her expert, Nancye Combs, based upon – UPS's (1) "Americans with Disabilities Act Procedural Compliance Manual"; (2) "ADA Procedure Flowchart"; and (3) "Income Protection Plan Q&A."  Hughes was

unsuccessful because the circuit court sustained UPS's objections to their relevance: UPS argued none of those policy sources was effective during the events of Hughes' termination; and that an affidavit of one of its corporate representatives – which indicated those policies *were* effective – was incorrect.

On appeal, Hughes argues the circuit court should not have disregarded the affidavit, and that it should have instead relied upon the affidavit as a ground to deem the policy sources relevant and admissible. As to why those policy sources were relevant to her case, Hughes cites the explanation she provided in her KRE[54] 103(a)(2) offer of that proof:

> 5. Plaintiff's HR Expert Nancye M. Combs, AEP-SPHR would have testified that the policies and procedures applicable to UPS's administration of Ms. Hughes['] leave – provide additional support for Ms. Hughes' claims that the leave policies violated Kentucky's protections against discrimination and retaliation – by applying a 100% healthy requirement and by undermining her right to a good faith interactive process. Regardless of the outcome of the ADA process, Ms. Hughes would not be permitted to return to her prior job or any job.

> 6. Ms. Combs would have testified based on her review of the factual records, most of which was internal to UPS and to which Ms. Hughes would not otherwise be privy, that UPS did not follow its own administrative guidelines with respect to Ms. Hughes in commencing and completing interactive process – treating her differently than other employees.

---

[54] Kentucky Rule of Evidence.

7. Ms. Combs would have testified based on her review of the factual records, most of which was internal to UPS and to which Ms. Hughes would not otherwise be privy, that UPS did not follow its own administrative guidelines in terminating Ms. Hughes['] healthcare benefits retroactively despite UPS finally beginning its ADA process two (2) weeks earlier – a process that takes up to thirteen (13) weeks.

Record at 6163.

To be clear, even if these policies were effective during the pertinent events of this case, they would have been irrelevant and prejudicial if they imposed a higher standard than the law required; and redundant and potentially prejudicial if they were consistent with what the law required. UPS's policies and procedures would only have been relevant if they called for treating employees in a manner that does not meet the standard required by law, and evidence demonstrated Hughes was damaged because those lesser standards were followed.

With that in mind, we return to why Hughes believes these polices were relevant. In paragraphs "5" and "6" set forth above, Hughes argues the policies were relevant because they illustrated: (1) UPS had policies that were *per se* discriminatory; and (2) UPS failed to commence and complete the ADA "interactive process." As we have already discussed, the circuit court effectively mooted those points when it properly directed a verdict in favor of UPS regarding Hughes' disability discrimination claim: absent any evidence that Hughes was capable of performing the essential functions of her job with reasonable

accommodation, Hughes could not demonstrate she was damaged because UPS followed a lower standard than what the law required when it terminated her. As for paragraph "7," Hughes did not plead any cause of action that alleged UPS wrongfully terminated her *healthcare benefits*. That, too, is a point we have already discussed and need not revisit. The circuit court's exclusion of this evidence was at worst harmless error. CR 61.01.

2. The exclusion of "documents from UPS's own file."

>Relative to this point, Hughes argues:

>As part of her case, Ms. Hughes also sought to introduce documents produced by UPS that were contained in her employment file – including UPS'[s] internal timeline of events that confirmed Ms. Hughes' testimony. These same internal notes were redacted in part by UPS and disclosed on a privilege log stating:

>>Confidential information containing counsel's legal advice regarding company employment procedures and policies.

>The Trial Court refused to allow Ms. Hughes to introduce the document as part of her proof, and the court again erroneously refused to allow her HR expert – Ms. Combs – to testify concerning her review of the very same documents. This again violated KRE 703(a); *Parrish* [*v. Kentucky Bd. of Medical Licensure*, 145 S.W.3d 401 (Ky. App. 2004)]; *Morrow* [*v. Stivers*, 836 S.W.2d 424 (Ky. App. 1992)]. Yet again, the Trial Court accepted the bare representations from UPS'[s] counsel disclaiming any knowledge of the source of the document. The exclusion of this document, as well as all other documents UPS produced and that Ms. Hughes sought to introduce as evidence, was highly prejudicial and warrants a new trial.

App. Brief at 33-34.

We disagree. To start, we will not find error regarding the circuit court's exclusion of unnamed "documents" that Hughes fails to make specific arguments about, much less identify. As for "UPS'[s] internal timeline of events" – the single document Hughes does identify – the document provides:

> **MARION HUGHES**
> Hire Date: 09-09-02
> Employee Number: 0559842
>
> 03-10-06
>
> Marion Hughes called Lori Broughton around 3:30 p.m. and informed her she was being released to return to work with restrictions and was returning on Monday. She had lifting restrictions and could not work overtime. Lori Broughton informed Jennie Davis of this and Jennie asked Lori to return the call to Marion and asked her to fax us a copy of the restrictions.
>
> A fax was received from Louisville Women's Healthcare office at 4:05 p.m. Restrictions were: Had surgery on 01-24-06 and is released to return to work as of 03-13-06. She has been advised not to lift more than 10 lbs. until further notice and not to work more than 40 hours per week until 03-27-06.
>
> Lori informed Marion that Jennie would call her on Monday regarding the restrictions.
>
> 03-13-06
>
> Jennie Davis called Marion and informed her she must be able to perform the essential functions of the job. As these restrictions did not allow her to do her all [sic]

essential functions of the job, she would remain off work. Marion stated she needed to return to work. This was her life. Why couldn't she return with restrictions since she had been able to do so in the past? Jennie explained that although she had been able to work light duty in the past, the company procedures have changed and prior to returning to work, employees must be able to perform the essential functions of the job. There was discussion regarding Marion applying at the same company (Cardinal Health Care) that Bernie Menear was now working. The doctor had wanted Marion to get another job where she could sit and not lift.

03-06

Marion called Jennie and informed her that she had a phone interview with Cardinal Health Care. Jennie and Marion talked about interviewing skills and reviewed some questions that could be asked. Marion was excited about this opportunity.

Marion called Jennie and told her she thought the phone interview went well. Marion asked Jennie when she would be terminated. Jennie explained she would be administratively termination [sic] one year from the date she went out on leave of absence (Date of Leave: 01-03-06).

Marion called Jennie and stated her short term disability had been denied due to lack of medical document [sic]. Jennie instructed Marion to call her doctor and ensure medical documentation was provided to Broadspire. Marion stated the doctor had sent everything but this goes back to the 2003 surgery. Jennie informed Marion she should contact that physician and make sure all the medical documentation was provided to Broadspire. Marion informed Jennie she was going to apply for unemployment benefits. Marion asked if this would get approved? Jennie told Marion she needed to be able and ready to work, but the decision would be up to the

Claims office at the Department of Employment Services.

## DISTRICT LOG NOTE ON SHORT TERM DISABILITY

**1/13- STD benefits approved 1/6/06 thru 2/4/06. 2/10- STD benefits approved thru 3/4/06 with [estimated return to work] 3/27/06. 3/8- STD BENEFITS APPROVED THRU 3/11/06 WITH ERTW 3/13/06. 3/20- STD benefits denied 3/12/06 due to lack of sufficient medical information to support disability**.

03-28-06

Jennie Davis received Unemployment Claim on Marion Hughes. Jennie completed form and faxed same day.

04-14-06

Notice of Determination was received. "A worker must be physically and mentally able to work, available for suitable work and actively seeking work. The claimant had been under the care of a physician and has now been released for light duty work with restrictions on 03-13-06. The employer does not have any work that will accommodate her restrictions. The evidence of record establishes the employer doe [sic] not have light duty work available for the claimant. The claimant is able and available for work. RULING: The claimant is allowed benefits based upon this determination.

05-05-06

Marion Hughes came to the annual Derby event held at the facility, approached the building manager (Deena Pluhar) about returning to work. Deena Pluhar informed Marion as much as we like Marion, we can't bring her back until she can meet the full job requirements. Deena informed Marion she would look into it. (Marion

-69-

participates in every event that is held by UPS, almost always winning prizes for great entries.)

05-16-06

Marion called Jennie and informed her she could not reach Deena. Marion told Jennie, Deena had informed her during the event that she was going to talk to her boss and asked Jennie if she had done so. Jennie informed Marion she was unaware of this conversation. Marion told Jennie that Deena told her to call back each week.

(In conversation with Deena, Jennie was informed that Deena did not ask Marion to call back each week. Deena had reiterated we could not bring her back to work.)

05-30-06

Marion again called Jennie. Jennie informed her nothing had changed from the conversation they had initially. Marion became upset and stated she was being informed to file a law suit – she wanted to come back to work and she couldn't understand why Jennie didn't fight for her.

5-31-06

Marion called and apologized to Jennie.

## DISTRICT LOG ON SHORT TERM DISABILITY

06/13 – STD benefits are in APPEAL!

07-14-06

Per instructions from Steve Holt, Jennie called Marion. [Phone number omitted.] No one answered – Jennie left a message that the District office would be mailing her some paperwork to complete regarding permanent restrictions and ADA qualification. Give the paperwork to your physician. Jennie explained she would be out on

vacation the week of July 17.  Please call if she had any questions.

**Redacted – Privileged**

When Hughes attempted to introduce this document at trial, the circuit court sustained UPS's objection to doing so on authentication grounds:  UPS noted the document was undated, bore no indication of its author, and UPS represented that none of its agents could verify it originated from UPS.  Hughes, for her part, had argued that because UPS had produced the document in discovery (albeit seventeen years before this case was tried), the document was "implicitly" authenticated.  That is the same argument she now poses on appeal.  However, we must circle back to what the circuit court added when it sustained UPS's objection: "Frankly, it supports the company's position.  So, I don't know why they're contesting it."[55]

We are also at a loss regarding how the exclusion of this document prejudiced Hughes.  Even if it "confirmed Ms. Hughes' testimony" as she vaguely argues, nothing on its face conflicts with the crux of the circuit court's directed verdict regarding her disability discrimination claim, *i.e.*, that she was incapable of performing an essential function of her job, with or without reasonable accommodation.  Further, Hughes does not explain how the admission of this

---

[55] *See* VR, May 25, 2023 at 10:54:18-10:54:22.

document might have altered the jury's decision regarding her retaliation claim; we are unable to discern how it could have done so; and it is not our responsibility to guess. The exclusion of this document was at most harmless error. CR 61.01.

3. The exclusion of "corporate depositions."

Hughes argues the circuit court erred because it did not permit her to utilize discovery depositions of two UPS corporate representatives, Rodeena Pluhar and Craig Thomas Holmes, as substantive evidence during her case-in-chief. To that effect, she correctly notes that, pursuant to CR 32.01(b), deposition testimony of a party-opponent (or the corporate representative of a party-opponent) may be read to the jury as substantive evidence even if that individual is available to testify in person. *See Lambert v. Franklin Real Est. Co.*, 37 S.W.3d 770, 779 (Ky. App. 2000). Hughes then further asserts "it is prejudicial, and reversible error, to deny a party to use a party-opponent's deposition in his case in chief even if the deponent is present at trial."[56] In support of that broad statement – and what seems to be her assertion that the exclusion of a party-opponent's deposition in and of itself constitutes reversible error – she cites *White v. Crawford*, 346 S.W.2d 308, 310 (Ky. 1961).

However, Hughes misreads *White*. There, the trial court's refusal to permit the plaintiff to utilize the defendant's deposition during his case-in-chief

---

[56] App. Brief at 29.

was deemed reversible error by our former High Court only because the plaintiff identified the part of the deposition she believed was relevant and admissible and wished to introduce; and because the Court, upon review, determined that evidence was indeed relevant and admissible and that its exclusion was prejudicial:

> [A]ppellee's statements create an inference that he may have been negligent in failing to see that he could move his car with safety to the appellant and in failing to yield the right of way to her under KRS 189.570(2) sufficient to take her case to the jury. *For this reason, the ruling was prejudicial.* The presence of the appellee in the courtroom did not justify the failure to admit the deposition since the same statements made in the deposition might not then be made again, and the appellant should not have been compelled to call appellee as a hostile witness and then possibly have had to use the deposition by way of impeachment.

*White*, 346 S.W.2d at 310 (emphasis added). In other words, the *White* Court did nothing more than follow two basic rules of evidence: (1) regardless of its origin, evidence must be relevant and otherwise admissible before it can be considered at trial; and (2) relief cannot be granted relative to any evidentiary error unless the error is, demonstrably, something more than harmless. CR 61.01; *see also Hashmi v. Kelly*, 379 S.W.3d 108, 112 (Ky. 2012) ("CR 32.01's allowance of the use of the deposition for 'any purpose' is not expansive and cannot justify the admission of testimony that could not be admitted through a live witness.").

-73-

With that in mind, Hughes offers only the following nebulous

statement in her opening brief regarding why the depositions she was prevented

from using were relevant:

> [W]ithout Pluhar's or Holmes' corporate depositions,
> Hughes' [] case in chief on retaliation and discrimination
> was limited to her and her expert's testimony. This
> testimony was further hampered by UPS's repeated
> evidentiary objections – objections that the depositions
> would have eliminated.

App. Brief at 31. Elaborating somewhat more in her reply brief, Hughes then adds:

> Without the deposition testimony *regarding UPS's leave
> policies and Ms. Hughes' employment file*, Ms. Hughes
> was left only with her own testimony and the testimony
> of her expert, both of which were hampered by
> arguments and rulings alleging lack of foundation and
> lack of authentication that would have been avoided if
> the corporate representatives' depositions had been
> allowed.

App. Reply Brief at 30 (emphasis added).

Hughes fails to indicate which part of those depositions she wished to

introduce at trial or for what purpose, and we are not obligated to guess. At most,

it appears she is insinuating the depositions could have functioned as a conduit for

admitting UPS's "written leave policies" and the "timeline" document discussed

previously – evidence the circuit court committed, at worst, harmless error by

excluding. Having failed to demonstrate the circuit court committed more than

harmless error by excluding these depositions, she is entitled to no relief in this regard, either.

4. The non-exclusion of Craig Thomas Holmes' testimony.

Craig Thomas Holmes has been UPS's in-house "labor and employment" counsel since 1998. Holmes testified he provided corporate oversight to UPS and its subsidiaries regarding labor and employment policies and procedures, and that he had personal knowledge of UPS's employee policies and procedures that were in effect during 2006, particularly those involving the ADA and employee leave. He testified those policies were outlined in UPS's "Working Together" employee handbook. After consulting the handbook, which Hughes had already introduced as an exhibit at that point, Holmes described UPS's general procedure regarding how the "ADA interactive process" was initiated. He also discussed the so-called "12 Month Leave Policy" set forth in the handbook, which provided employees "absent from the job for 12 months" – regardless of whether they have been on long-term disability – are "administratively terminated from the Company[.]"[57] Holmes testified he had been present for the duration of the trial,

_____

[57] The relevant text of this policy appears on p. 26 of the "Working Together" handbook (Record at 6056). It provides:

**Long-Term Disability**

- The Company provides Flex credits for employees to purchase Long-Term Disability (LTD). Employees have the option of electing 50% of base pay to a "limiting age," 60% of base pay to a "limiting age" or 60% of base

that he was familiar with the testimony and evidence that had been adduced at trial

thus far regarding the circumstances of Hughes' termination, and that Hughes'

termination in April 2007 appeared consistent with his understanding of how UPS

applied its 12 Month Leave Policy. To that end, Holmes was asked to explain the

disparity between what the leave policy required (*i.e.*, termination after an

employee is absent from the job for 12 months) and what UPS did in this

circumstance (*i.e.*, UPS terminated Hughes after she was absent from the job for

thirteen months following her three months of FMLA leave).

> COUNSEL: Now, you've heard testimony that Ms.
> Hughes' employment was separated in around April of
> 2007. Do you recall that testimony?
>
> HOLMES: Yes.
>
> COUNSEL: And was that consistent with [UPS's]
> policies at the time?
>
> HOLMES: Yes. Yes, it was.
>
> COUNSEL: How so?

___

pay for 5 years. The limiting age of the full-time eligible employee is
reflected in the UPS Flexible Benefits SPD.

- In the event of an approved LTD, the benefit begins after payment of 26
  weeks of STD. The employee has the option to use accrued by unused
  vacation to bring the benefit up to 100%.

- *The employee is administratively terminated from the Company after
  being absent from the job for 12 months*.

(Emphasis added.)

-76-

HOLMES: Well, so we have an administrative separation policy that is where the general rule is that you're going to be separated after one year of an absence, okay. So, there are exceptions to that, though. Like I said, it's a general rule, one year, but there are exceptions. And one of the exceptions are, we see in this case, where someone has filed an EEOC charge, we pause the administrative separation in order to let the EEOC charge let its course before any separation happens.

COUNSEL: And you've heard the testimony today that, or this week, that Ms. Hughes had an EEOC charge pending at the time she would have hit that twelve-month mark?

HOLMES: Yes, I've heard that.

COUNSEL: And she, consistent with your policy, she remained there beyond that twelve-month policy, until the EEOC issue was resolved?

HOLMES: That's correct.

COUNSEL: And she was terminated after the EEOC issue was resolved?

HOLMES: That's correct.

VR, May 25, 2023 at 10:15:40-10:16:56.

During cross-examination, Holmes candidly admitted having no direct or personal knowledge of the events surrounding Hughes' claims, including whether UPS provided Hughes the ADA "interactive process"; or how UPS may have applied any of its leave policies to Hughes. He reiterated that his testimony was limited to his personal knowledge of UPS's operative policies and how they

-77-

were generally applied.  Whereupon Hughes moved to strike Holmes' testimony in its entirety because, in her view, Holmes had no personal knowledge of anything relevant to her claims.  In response, UPS noted it had only called Holmes as a witness to testify regarding his personal knowledge of UPS's effective policies and how they were generally applied; and that at the very least his personal knowledge of how UPS generally applied its "12 Month Leave Policy" was relevant to why Hughes was terminated over a year after she was placed on personal leave.  The circuit court denied Hughes' motion.

Hughes now reasserts that Holmes' testimony should have been stricken in its entirety because he admittedly had no personal knowledge of her or her claims, and that the circuit court's refusal to do so was prejudicial error warranting reversal.  But, Hughes does not explain *why* Holmes' testimony was prejudicial.  The jury should have been under no illusion that Holmes had personal knowledge of Hughes or her claims: he never testified that he did; he repeatedly admitted during cross-examination that he did not; he only testified having personal knowledge of UPS's operative policies and how they were generally applied; and he acknowledged he did not know how those policies had been specifically applied to Hughes.

Furthermore, the fact that UPS had its "12 Month Leave Policy" in place between when Hughes was placed on leave and when she was ultimately

terminated from employment was relevant to Hughes' retaliation claim, such as it was. As discussed, Hughes sought to infer retaliation from the close temporal proximity between the date of her termination and the date her EEOC charge was resolved. But, when an employer proceeds along lines previously contemplated (*i.e.*, consistently with an existing policy), "we must not take the temporal proximity of the adverse employment action as evidence of causality." *See Montell*, 757 F.3d at 507.

That aside, any issues regarding Holmes' testimony regarding UPS's ADA "interactive process" were mooted by the circuit court's directed verdict regarding Hughes' disability discrimination claim. And, to the extent Hughes believes Holmes' testimony regarding UPS's "12 Month Leave Policy" improperly rebutted an inference of retaliation that might otherwise have been drawn from the temporal proximity between the termination of her employment and her "protected activity" of having her EEOC claim dismissed and receiving an attendant "right-to-sue" letter, we reemphasize: the dismissal of an EEOC claim and receipt of an attendant "right-to-sue" letter *is not protected activity* for purposes of an unlawful retaliation claim. Having failed to demonstrate the circuit court committed more than harmless error by failing to strike Holmes' testimony, Hughes is entitled to no relief in this regard, either.

**D. The remaining aspects of these appeals are moot**.

Lastly, Hughes takes issue with the circuit court's refusal to instruct the jury that it could award her punitive damages. Because the only claims she asserted were rejected by the jury or dismissed by the circuit court, and we are affirming that disposition, that issue is moot. As for UPS's cross-appeal (No. 2023-CA-1187-MR), UPS prefaces it with the following statement: "In the event that this Court determines a new trial is appropriate, certain issues should be corrected to avoid prejudice to UPS at any retrial."[58] Because we are affirming, the issues UPS raises in its protective cross-appeal are likewise moot. No discussion of those issues is necessary or warranted.

### III. CONCLUSION

Consistently with the foregoing, we AFFIRM with respect to Appeal No. 2023-CA-1113-MR. We DISMISS as MOOT Cross-Appeal No. 2023-CA-1187-MR.

ALL CONCUR.

ENTERED: ___05-16-2025___          _____
                                   JUDGE, COURT OF APPEALS

---

[58] Appellee Brief at 38.

BRIEFS FOR APPELLANT/CROSS-APPELLEE:

Michael D. Grabhorn
Andrew M. Grabhorn
Kevin C. Burke
Louisville, Kentucky

BRIEF FOR APPELLEES/CROSS-APPELLANTS:

Griffin Terry Sumner
Kyle D. Johnson
Jennifer L. Bane
Louisville, Kentucky